IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

```
LILLIE WILLIS, et al,                    No C 04-2305 VRW

        Plaintiffs,                      ORDER

        v

CITY OF OAKLAND, et al,

        Defendants.
                                    /
```

       Plaintiffs Lillie Willis ("Lillie") and Lavita Oliver ("Oliver") (collectively "plaintiffs") allege violations of federal and state law based upon the events leading up to and surrounding the shooting death of Glen Willis ("Willis"). Doc #1 (Complaint). Defendants have moved for judgment on the pleading pursuant to FRCP 12(c). Doc #15. Plaintiffs, on the other hand, seek leave to file an amended complaint. Doc #24. The court heard oral arguments on these motions on February 24, 2005. For the reasons that follow, the court GRANTS plaintiffs' motion to amend and DENIES as moot defendants' motion. Additionally, the court ORDERS plaintiffs'

counsel to SHOW CAUSE why they should not (i) pay defendants' reasonable attorneys fees and costs incurred to date pursuant to 28 USC § 1927 and (ii) be sanctioned pursuant to FRCP 11.

I

On June 14, 2004, attorney John L Burris filed a complaint bearing his signature, on behalf of Lillie Willis and Lavita Oliver, respectively the mother and sister of Glen Willis. Doc #1 (Compl). The complaint alleged that on August 5, 2003, Oliver contacted 911 due to concerns about Willis' conduct. Doc #1 at 5, ¶10. While the complaint states that Willis was a diagnosed schizophrenic who lived alone, the complaint does not allege Willis' "conduct" that concerned Oliver. Id. Two officers were dispatched to Willis' home. On arrival, the officers were unable to locate Willis. Id. The next day, August 6, 2003, Oliver "found her brother to be home and spoke with him." Id. "On the basis of her observation of his condition, she again called the 911 dispatcher." Id. According to the complaint, Oliver wanted the Oakland Police Department to "take [Willis] into custody for treatment under § 5150 of the California Welfare and Institutions Code as a person manifesting mental derangement." Id at 1-2, ¶1. In response to the second 911 call, defendants Fought and Clement, Oakland police officers, drove to Willis' home where they were met by Oliver who informed them that "Willis was mistrustful, was likely armed with a knife and that it would be advisable to call for additional backup and an ambulance." Id at 5, ¶10. The complaint then alleges that Fought "obtained the house keys from OLIVER and gave them to CLEMENT who opened the front door." Id.

2

Willis was "immediately inside the door and lunged at CLEMENT, stabbing him in the arm, at which point FOUGHT shot WILLIS in the back with fatal result." Id.

Following these factual allegations, the complaint alleges a scattershot of claims of behalf of Oliver, in her individual capacity, and Lillie, both individually and as Glen Willis' personal representative: (1) § 1983 claim for excessive force in violation of the Fourth, Fifth and Fourteenth Amendments to the United States Constitution (Doc #1 at 8), (2) § 1983 survival claim for violation of the Equal Protection Clause of the Fourteenth Amendment (id at 8), (3) § 1983 wrongful death claim, again predicated on the Fourth, Fifth and Fourteenth Amendments (id at 6), (4) § 1983 familial relationship claim, predicated on the First, Fourth and Fourteenth Amendments (id at 7), (5) negligence claim for wrongful death (id at 9-10) and (6) intentional infliction of emotional distress (id at 10). The complaint names as defendants: (1) City of Oakland ("Oakland"), (2) Richard Word ("Word") in his official capacity as Oakland Chief of Police, (3) Officer Fought and (4) Officer Clement.

On November 8, 2004, Oakland, Word and Fought filed a joint motion for judgment on the pleadings pursuant to FRCP 12(c). Doc #15. On December 20, 2004, Clement joined in the Rule 12(c) motion. Doc #19. While arguing such procedural issues as Oliver's standing to bring certain claims and the lack of factual allegations regarding an equal protection violation, the gravamen of defendants' motion was that, under the facts alleged in the complaint, Fought's use of deadly force was reasonable as matter of law under the Fourth Amendment and thus no legitimate causes of

action could flow from the August 6, 2003, incident.  Doc #15 at 3-4.  Defendants have ample Ninth Circuit precedent to support their position.  See <u>Reynolds v County of San Diego</u>, 84 F3d 1162, 1168 (9th Cir 1996) (holding that deadly force was reasonable as a matter of law where an individual, acting erratically, swung a knife at officers).  See also <u>Haugen v Brosseau</u>, 339 F3d 857, 863 (9th Cir 2003) ("Where a suspect threatens an officer with a weapon such as a gun or knife, the officer is justified in using deadly force."), rev'd on other grounds, 125 S Ct 596 (2004) (citation omitted).

On January 13, 2005, plaintiffs filed a document labeled as an "opposition" to the motion for judgment on the pleadings.  Doc #20.  This memorandum, however, appears to concede that defendants are entitled to judgment on the pleadings.  In the first sentence of the memorandum's argument, plaintiffs state that they "seek leave to amend the complaint to clarify causes of action they intend to maintain and to eliminate the claims to which defendants' [sic] correctly demur."  Id at 3.  Next, and perhaps most important, plaintiffs state that they "are able to allege additional facts which will enable their claims to be litigated."  Id at 3.  Implicit in this statement is that the current recitation of the "facts" in the complaint does <u>not</u> allow plaintiffs' claims to be litigated.

In addition to the new factual allegations in their "opposition," plaintiffs also state that if they are granted leave to amend, they will not reallege (1) any claims based upon the equal protection clause of the Fourteenth Amendment, (2) any claims based upon Cal Civ Code § 52.1 and (3) any claims in an individual

**4**

capacity under the Fourth Amendment. Id at 4. Moreover, plaintiffs state that the amended complaint "will not state a direct cause of action against the City of Oakland nor will Chief of Police [Word] be a named defendant." Id.

Construing this "opposition" as a misguided motion for leave to file an amended pleading, the court ordered plaintiffs to file a proper motion for leave to file an amended pleading. Doc #23. Pursuant to Civ L R 10-1(b), the court ordered plaintiffs simultaneously to file a proposed first amended complaint (PFAC) with the motion for leave. Id.

On February 11, 2005, plaintiffs filed their motion for leave to amend, Doc #24, and included the PFAC. Doc #25. The PFAC includes a section titled "FACTS COMMON TO ALL CAUSES OF ACTION." Doc #25 at 4-6. Even a superficial reading of the allegations recited in the PFAC reveals substantial differences between these factual allegations and the allegations contained in the original complaint. The PFAC contains allegations that <u>directly contradict</u> allegations in the original complaint. Because these differences are critical to the outcome of the current motions, the court will recite the factual allegations contained in the PFAC and in brackets contrast these new allegations with the different or contradictory allegations in the original complaint.

According to the PFAC, on August 6, 2003, Oliver "went to see Glen Willis, found him at home and a [sic] called 911, requesting that officers be dispatched." Id at 4-5, ¶13. In response to the 911 call, Fought and Clement arrived and were informed by Oliver that her brother "was a paranoid schizophrenic, had knives and that his doctor wanted to commit him under section

5

1  **5150 of the Welfare and Institutions Code." Id at 5. Next,**
2  **"FOUGHT insisted that OLIVER provide him with the phone number to**
3  **call Glen Willis. OLIVER told FOUGHT that calling on the telephone**
4  **would only make him worse and that he would not answer the**
5  **telephone in any event." Id. Upon making the telephone call,**
6  **however, Fought received no "response" from Willis. Id. [This**
7  **entire factual scenario is new. The original complaint contains no**
8  **allegations regarding (1) Fought's insistence on calling Willis,**
9  **(2) the fact that he actually called inside the house or (3)**
10 **Oliver's warning that such telephonic activity would only make him**
11 **worse.]**
12 **Undeterred by the unanswered telephone call, "FOUGHT then**
13 **demanded the house keys from OLIVER. OLIVER strenuously warned**
14 **them that in her brother's condition, entering the house would be**
15 **provocative and reminded the officers that Willis was armed with**
16 **knives." Id (emphasis added). [The original complaint stated that**
17 **Fought "obtained," not "demanded," the house keys from Oliver who**
18 **voluntarily gave Fought the keys because she wanted the officers to**
19 **take Willis into custody. Moreover, the original complaint is**
20 **devoid of any reference to Oliver's strenuous warning to Fought and**
21 **Clement that entering the house would provoke her brother.]**
22 **"FOUGHT took the keys, gave them to CLEMENT and the**
23 **officers went to the front door. When CLEMENT unlocked the**
24 **security gate, Glen Willis opened the inner door and stabbed**
25 **CLEMENT in the arm." Id. [In the original complaint, Clement was**
26 **the one who opened the door, not Willis.] "The knife lodged in**
27 **CLEMENT's arm and at that point, Glen Willis had no remaining**
28 **weapon." Id. [In the original complaint, there is no allegation**

6

1  that the knife lodged in Clement's arm leaving Willis unarmed.
2  Rather, the original complaint simply alleged that Willis stabbed
3  Clement in the arm.]

4  After Willis had stabbed Clement, "FOUGHT shot Willis in
5  the back and Willis fell to the ground."  Id, ¶14.  [In the
6  original complaint, Fought shot Willis and killed him.  According
7  to the PFAC, Fought's gunshot only wounded Willis, it did not kill
8  him.]

9  "Although Willis was seriously wounded and obviously
10 unarmed, CLEMENT then approached Willis, who was prone on the
11 ground and posed no reasonable threat of further violence to
12 anyone, and shot him in the head, killing him."  Id.  [In the
13 original complaint, it was Fought who killed Willis with the shot
14 to the back; Clement never fired any shots.  In the PFAC, however,
15 Clement not only shot Willis, but in fact delivered the fatal shot,
16 to the head, even though Willis was wounded and unarmed.]

17 "At the time CLEMENT shot him, Willis made no aggressive
18 or furtive movements which would suggest to a reasonable officer
19 that he was armed with any kind of weapon, or had the will, or
20 ability to inflict substantial bodily harm on any individual."  Id,
21 ¶15.  [The original complaint is devoid of any of these
22 allegations.]

23 The following chart summarizes the inconsistencies:
24 //
25 //
26 //
27 //
28 //

| Complaint, Doc #1 | Proposed FAC, Doc #25 |
|---|---|
| [There are NO allegations of this type in the complaint] | "FOUGHT insisted that OLIVER provide him with the phone number to call Glen Willis. OLIVER told FOUGHT that calling on the telephone would only make him worse and that he would not answer the telephone in any event. FOUGHT insisted, received the telephone number and called with no response." p 5, lines 5-10. |
| "Officer FOUGHT obtained the house keys from OLIVER" p 5, lines 15-16.<br><br>[There are no allegations regarding Oliver's strenuous warning] | "FOUGHT then demanded the house keys from OLIVER. OLIVER strenuously warned them that in her brother's condition, entering the house would be provocative and reminded the officers that Willis was armed with knives." p 5, lines 10-13. |
| Fought "gave [the keys] to CLEMENT who opened the front door. Glen Willis was immediately inside the door" p 5, lines 16-17. | "When CLEMENT unlocked the security gate, Glen Willis opened the inner door" p 5, lines 15-16. |
| Willis "lunged at CLEMENT, stabbing him in the arm" p 5, lines 18.<br><br>[There are no allegations that the knife lodged in Clement's arm or that Willis was left unarmed.] | Willis "stabbed CLEMENT in the arm. The knife lodged in CLEMENT's arm and at that point, Glen Willis had no remaining weapon." p 5, lines 16-18. |
| After Willis stabbed Clement, "FOUGHT shot Willis in the back with fatal result." p 5, line 19. | "FOUGHT shot Willis in the back and Willis fell to the ground." p 5, lines 19-20. |
| [No allegations that Clement ever fired a gun] | "Although Willis was seriously wounded and obviously unarmed, CLEMENT then approached Willis, who was prone on the ground and posed no reasonable threat of further violence to anyone, and shot him in the head, killing him." p 5, lines 20-23. |

Plaintiffs' "opposition" to defendants' Rule 12(c) motion is signed by Miles Washington, Doc #20, and the PFAC is signed by both Burris and Washington. Doc #25. At the February 22, 2005, hearing, the court questioned both Burris and Washington regarding

the factual inconsistencies between the complaint and the PFAC.  Tr at 3:3-6, 4:22-25.

Burris stated that, prior to the filing of the original complaint, he had interviewed the "whole family at the outset of the case" and that they "related the story" contained in the complaint.  Tr at 7:6-7.  Once Burris had interviewed the witnesses and gotten what he called "the facts," he "ultimately turned the case over to Mr Washington to do the case."  Id at 7:13-14.  It appears that Washington and Burris are not partners; each apparently owns his own law practice although correspondence to the court bears a letterhead "Law Offices John L. Burris" and lists both Burris and Washington.  Doc #30 (6/14/05 Letter from Washington).  Both Burris and Washington would appear, therefore, to be jointly responsible for any costs or liability arising from the filing and prosecution of this case.  It also appears that Burris conducted no independent investigation beyond the purported interview with Willis' family.

Accordingly, the court turned to Washington, who apparently drafted the complaint (although Burris signed it), in an attempt to reconcile the inconsistencies between the complaint and the PFAC.  The following dialogue will suffice to demonstrate Washington's explanation for these inconsistences:

> COURT: My concern is this, Mr. Washington, if the facts in the [PFAC] proved to be correct * * * then it would appear the investigation that was done in connection with the initial Complaint is inadequate.
>
> COUNSEL: It could be, Your Honor, <u>as a result of time and urgency</u>, [the investigation] may very well have been [inadequate].  I did not have an opportunity to contact her.  I didn't even know at the time who the witnesses were.  As

9

```
                I said before, I had not had an opportunity to
                meet with them.
Tr at 6:14-7:1 (emphasis added).
```

According to Washington, Burris' possibly inadequate investigation and Washington's drafting of a complaint without meeting plaintiffs or conducting his own investigation is explained, and any deficiencies excused, because the "period of time to file the Complaint was getting pretty close to expir[ing]." Tr at 4:14-16.

The court is at a loss to understand this. Six of the seven claims[1] asserted in the complaint (three § 1983 claims, wrongful death and intentional infliction of emotional distress) have a <u>two</u>-year statute of limitations pursuant to Cal Code Civ Pro § 335.1. See <u>Wilson v Garcia</u>, 471 US 261, 280 (1985) (holding that § 1983 claims are governed by state statute of limitations pertaining to personal injury actions). The remaining claim, a state law claim for violation of rights guaranteed by the federal or state constitution, has a statute of limitations of <u>three</u> years. Cal Code Civ Pro § 338. The shooting of Willis occurred on August 6, 2003. Accordingly, <u>none</u> of plaintiffs' claims would have expired prior to August 6, 2005. Plaintiffs' counsel filed the original complaint on June 11, 2004 – <u>fourteen months before any claim was set to expire</u>. Burris and Washington appear to have had plenty of time to perform an adequate investigation. No consideration of time and urgency is apparent that would excuse the inadequate investigation which preceded the filing.

Next, the court stated that "in view of what appears to be the inadequate investigation that was done in connection with

---

[1] The complaint combines the § 1983 excessive force and the equal protection claims together.

10

filing the first Complaint, why isn't filing of the [PFAC] a product of undue delay," for clearly no investigation was done in this case until after defendants' filed their Rule 12(c) motion. Tr at 10:11-14. Washington responded that defendants' Rule 12(c) "motion was filed in lieu of an answer. So we're talking about 30 days that they filed it from the time that the original Complaint was filed." Tr at 11:2-5. According to Washington, little more than 30 days passed between the filing of the original complaint and plaintiffs' request for leave to amend. Id.

But Washington's statements regarding the procedural posture of this case are simply wrong. The original complaint was filed on June 14, 2004, and defendants (contrary to Washington's representations) filed an answer on July 8, 2004. Doc #7. Moreover, defendants' Rule 12(c) motion was not filed until November 8, 2004, four months after an answer had been filed. Doc #15. Finally, plaintiffs waited over two months before filing their opposition/motion to amend. Doc #20. Contrary to Washington's representations, more than <u>seven months</u> passed between the filing of the original complaint and plaintiffs' request to amend.

It should be apparent that the court has misgivings about the origin of the new "facts" that form the basis of the PFAC. According to Washington, additional witnesses came forward and provided the additional and different facts, specifically that Clement, rather than Fought, killed Willis. Tr at 9:3-12. Needless to say, this is a highly relevant fact. Burris, however, claims that he had already interviewed the whole family at the outset of the case, so clearly Oliver had already told plaintiffs'

11

counsel her version of the events of August 6, 2003.  Tr at 7:5-8.  Neither the original complaint nor the PFAC identifies any witness other than Oliver.  Neither Burris or Washington have identified any new witnesses.  Any new witness remains a mystery.

Accordingly, the court is faced with counsel who (1) conducted an inadequate investigation preceding the filing of the original complaint, (2) have sought to justify this inadequacy by falsely representing that the statute of limitations on plaintiffs' claims were about to expire and (3) have misrepresented the procedural posture of this case to rebut a showing of undue delay.  The court concludes that Burris' and Washington's conduct appears to fall to the level warranting Rule 11 sanctions.  See <u>Huetting & Schromm, Inc v Landscape Contractors Council</u>, 790 F2d 1421, 1426-27 (9th Cir 1986) (affirming sanctions awarded solely against an attorney for a violation of Rule 11).

"[T]he central purpose of Rule 11 is to <u>deter</u> baseless filings in District Court * * *. [citation omitted]  Rule 11 imposes a duty on attorneys to certify that they have conducted a <u>reasonable inquiry</u> and have determined that any papers filed with the court are <u>well-grounded in fact</u> * * *."  <u>Cooter & Gell v Hartmarx Corp</u>, 496 US 384, 393 (1990) (emphasis added); see also <u>Golden Eagle Distributing Corp v Burroughs Corp</u>, 801 F2d 1531, 1542 (9th Cir 1986) ("Rule 11 is intended to * * * <u>deter</u>[] attorneys who submit motions or pleadings which cannot reasonably be supported in law or in fact." (emphasis added)).  To deter baseless filings, a district court may, on its own initiative, impose Rule 11 sanctions on attorneys who have filed a pleading premised on an inadequate investigation.  See FRCP 11(c)(1)(B).  The only qualification on

the court's discretionary power sua sponte to impose Rule 11 sanctions is that the court must provide Burris and Washington with a written order describing the specific conduct that appears to violate Rule 11 and provide them with an opportunity to show cause why they should not be sanctioned. Id. This order serves to give Burris and Washington notice of the specific conduct that appears to violate Rule 11.

Next, the court addresses whether Burris and Washington should be sanctioned under 28 USC § 1927. "Any * * * person * * * who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorney fees reasonably incurred because of such conduct." 28 USC § 1927. As this court has stated: The purpose of § 1927 is "to deter attorneys from multiplying legal proceedings unnecessarily, and to compensate attorneys forced to endure such proceedings." Winfield v Beverly Enterprises, 1994 US Dist LEXIS 2855, *10 (ND Cal 1994) (Walker, J). Sanctioning a party under § 1927 requires a "finding of recklessness or bad faith." Barber v Miller, 146 F3d 707, 711 (9th Cir 1998).

It goes without saying that Burris and Washington acted recklessly in filing the original complaint, a complaint they admit was premised on an inadequate investigation. This reckless behavior was unreasonable and vexatious in that it required the City Attorney of Oakland to (1) file a now useless answer, (2) research, draft and file a now moot motion for judgment on the pleadings and (3) prepare for and attend the February 24, 2005, oral argument. Section 1927 serves to compensate the City of

Oakland for having to endure these unreasonably multiplied proceedings.

These useless steps unnecessarily multiplied the proceedings. Defendants' Rule 12(c) motion and related steps were wholly unnecessary except for the unreasonable failure of plaintiffs' counsel to investigate before filing the initial complaint. This unreasonable conduct was undertaken by Burris and Washington, not plaintiffs. Burris and Washington are officers of the court and subject to the court's orders and directives with respect to their conduct of litigation in this court. <u>United States v Associated Convalescent Enterprises, Inc</u>, 766 F2d 1342, 1346 (9th Cir 1985).

Accordingly, Burris and Washington are each ORDERED to SHOW CAUSE in a writing, not to exceed 10 pages, why sanctions should not be jointly and severally imposed on them pursuant to (i) Rule 11 based on the inadequate investigation that preceded the filing of the original complaint and the blatant misrepresentations offered to the court at the February 24, 2005, hearing and (ii) § 1927 based upon the unreasonable and vexatious multiplication of these proceedings. Burris' and Washington's responses are due on or before July 1, 2005.

### III

Finally, the court turns to the merits of plaintiffs' motion for leave to file an amended complaint pursuant to FRCP 15(a). "[A] party may amend the party's pleading * * * by leave of court * * * and leave shall be freely given when justice so requires." FRCP 15(a). The Ninth Circuit directs district courts

**14**

to apply the policy of Rule 15(a) with "extreme liberality." <u>Morongo Band of Mission Indians v Rose</u>, 893 F2d 1074, 1079 (9th Cir 1990) (citing <u>DCD Programs, Ltd v Leighton</u>, 833 F2d 183, 186 (9th Cir 1987)).

It is clear that plaintiffs may be entitled to recovery if it is found that Willis' death was the result of excessive force and the other elements of § 1983 are satisfied. Given the fact that Washington (who drafted the original complaint) had not even <u>met</u> plaintiffs or any relevant witnesses prior to the filing of the original complaint, it is hard to sustain the idea that plaintiffs should be faulted for their counsels' inadequate investigation. Thus, as the court stated at the hearing, "it would be unjust to terminate the litigation at this point, which would be the [scenario] if [plaintiffs are] not permitted to amend * * *." Tr at 20:13-15.

Plaintiffs' amended complaint should be filed on or before July 1, 2005.

IV

In sum, plaintiffs' motion for leave to file an amended complaint (Doc #24) is GRANTED and defendants' motion for judgment on the pleadings (Doc #15) is DENIED as moot. Moreover, the court reminds plaintiffs' counsel that they agreed, on the record, to be bound by their statement not to reallege (1) any claims based upon the equal protection clause of the Fourteenth Amendment, (2) any claims based upon Cal Civ Code § 52.1 and (3) any claims in an individual capacity under the Fourth Amendment. Doc #20; See Tr at 3:1-16. Moreover, plaintiffs stated that any amended complaint

15

"will not state a direct cause of action against the City of Oakland nor will Chief of Police [Word] be a named defendant." Doc #20.  The PFAC, however, contains all of these allegations.

Because the PFAC asserts claims that plaintiffs agreed not to allege, the PFAC is flawed.  Hence, plaintiffs' amended complaint should not contain any claims they have agreed not to allege.

IT IS SO ORDERED.



VAUGHN R WALKER

United States District Chief Judge