**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LILLIE WILLIS, et al, | No C 04-2305 VRW |
| Plaintiffs, | ORDER |
| v | |
| CITY OF OAKLAND, et al, | |
| Defendants. | |

On July 26, 2005, the court entered an order finding that plaintiffs' counsel John L Burris and Miles Washington should be sanctioned pursuant to 28 USC § 1927 and FRCP 11.  Doc #36.  The July 26, 2005, order is hereby VACATED.  This order shall supersede the July 26, 2005 order.

For the reasons discussed below, the court SANCTIONS Messrs Burris and Washington pursuant to FRCP 11.  The court ORDERS Burris and Washington to pay $10,800 to the court on or before November 15, 2005.

//

I

On June 19, 2005, the court ordered Burris and Washington to show cause why they should not be sanctioned pursuant to FRCP 11 and 28 USC § 1927. Doc #30 at 12-14 (the "OSC"). The parties are familiar with the facts underlying the OSC and thus the court need not fully recite them here. Suffice it to say the court concluded that the filing of plaintiffs' complaint was predicated on an inadequate investigation and that this reckless behavior by Burris and Washington unreasonably and vexatiously multiplied the proceedings in this case. Id.

Burris and Washington filed their individual responses to the OSC on June 30, 2005. Docs #32 (Burris Resp); #33 (Washington Resp). In an order entered July 26, 2005, the court concluded that Burris and Washington had unreasonably and vexatiously multiplied the proceedings in this case in violation of 28 USC § 1927. Doc #36 at 5. The court directed defendants to file their request for attorney fees and costs reasonably incurred in (1) drafting and filing their original answer, (2) researching, drafting and filing their motion for judgment on the pleadings and (3) attending the February 24, 2005, hearing. Id. Defendants submitted their request for attorney fees and costs on August 12, 2005. Doc #38.

After reviewing the applicable law, the court concludes it cannot sanction the filing of the original complaint with an award of fees under § 1927. "The filing of a complaint may be sanctioned pursuant to Rule 11 or a court's inherent authority, but it may not be sanctioned pursuant to § 1927." In re Keegan Mgmt Co, Securities Litigation, 78 F3d 431, 435 (9th Cir 1996). This is so because § 1927 "applies only to unnecessary filings and tactics

2

once a lawsuit has begun." Id; see also <u>Zaldivar v City of Los Angeles</u> 780 F2d 823, 831 (9th Cir 1986) ("[T]he <u>multiplication</u> of proceedings is punished, thus placing <u>initial</u> pleadings beyond [§ 1927's] reach."); <u>Matter of Yagman</u>, 796 F2d 1165, 1187 (9th Cir), amended, 803 F2d 1085 (9th Cir 1986). Although the court is ultimately responsible for ensuring that the law is correctly applied in any case, the court notes that Burris and Washington failed to bring this point of law to the court's attention in their responses to the OSC.

The court now turns to evaluating the propriety of Rule 11 sanctions for the conduct addressed in the July 26 order.

II

"Where, as here, the complaint is the primary focus of Rule 11 proceedings, a district court must conduct a two-prong inquiry to determine (1) whether the complaint is legally or factually 'baseless' from an objective perspective, and (2) if the attorney has conducted 'a reasonable and competent inquiry' before signing and filing it." <u>Christian v Mattel, Inc</u>, 286 F3d 1118, 1127 (9th Cir 2002) (quoting <u>Buster v Greisen</u>, 104 F3d 1186, 1190 (9th Cir 1997)). In other words, it is not enough that an attorney conducted an insufficient factual investigation before filing the complaint; the complaint must also be, from an objective perspective, legally or factually baseless. See <u>In re Keegan</u>, 78 F3d at 434-35 (disapproving <u>Unioil, Inc v E F Hutton and Co</u>, 809 F2d 548 (9th Cir 1986)). The inquiry whether the complaint is factually baseless can be stated thus: Would a reasonable attorney have believed plaintiff's complaint to be well-founded in fact

3

1 based on what a reasonable attorney would have known at the time?
2 See id at 434.
3        With these legal principles in mind, the court turns to
4 the responses to the OSC submitted by Burris and Washington.

6                                   A
7        The first two pages of Burris's response read like a
8 curriculum vitae rather than a response to an order to show cause.
9 While the court does not doubt Burris's past contributions to the
10 California legal community, these accomplishments do not explain or
11 mitigate Burris's current behavior.  Indeed, Burris's years of
12 experience and success serve to <u>magnify</u> the egregiousness of the
13 conduct at issue in this case.
14        Turning to the relevant portions of Burris' response,
15 Burris claims that, initially, he and plaintiffs "had a lengthy
16 discussion about what happened to Gregory Lewis (the decedent) and
17 any related legal claims."  Burris Resp at 3 ¶7.  Burris claims
18 that "during the meeting[,] plaintiffs gave [him] the names of
19 potential witnesses."  Id ¶8.  Burris informs the court:

>        As is my customary practice, I hired a Private
>        Investigator to follow up with the witnesses whose
>        names were provided by the plaintiffs and to canvass
>        the neighborhood for potential witnesses.  The
>        investigator was Harvey Yarbrough.  Prior to filing
>        the lawsuit, Mr Yarbrough provided me with an oral
>        report with regard to the status of his
>        investigation.  I have been unable to contact Mr
>        Yarbrough at this time regarding this case due to
>        his retirement from private investigation.

Id ¶9.

Burris's response does not state whether Yarbrough confirmed or
refuted plaintiffs' account of events surrounding the death of Glen

**4**

Willis. Indeed, Burris does not substantively inform the court regarding <u>anything</u> Yarbrough allegedly told Burris. The court does not know who Yarbrough investigated, what these persons witnessed and relayed to Yarbrough or whether Yarbrough relayed this information to Burris.

Next, Burris states that he contacted Protection and Advocacy Inc (PAI), a publicly funded organization that advocates for the mentally and physically impaired. Id at 4 ¶10. Burris contacted PAI "seeking information about [cases] similarly related" to plaintiffs' case. Id. Burris states that "[PAI] was somewhat helpful in assessing this case." Id.

Based on these events alone, Burris asserts that he signed and filed plaintiffs' complaint "based upon [his] understanding of the facts at the time." Id at 4 ¶11. Accordingly, Burris signed the complaint based on (1) a single interview with plaintiffs, (2) an oral "status" report (the substance of which remains a mystery) from a now-unavailable Yarbrough and (3) some form of limited conduct with PAI, an agency with having no connection to the events giving rise to plaintiffs' complaint. This is not an adequate investigation. Burris does not explain (1) how the new and substantially different facts contained in the first amended complaint (FAC) were discovered or (2) why his adequate prefiling investigation (which Burris appears to claim he conducted) failed to uncover these "new" facts.

B

Burris states that "[a]t some point in the process, the case was assigned to Miles Washington, a member of this bar, who

5

leases office space in my suite, and who frequently works on my cases as an independent contractor." Id at ¶12. Washington's response to the court's OSC is essentially one-page in length. Doc #33. Although short, Washington's response (unlike Burris's response) is quite telling regarding the events that preceded the filing of plaintiffs' complaint.

Washington states that he "was requested by Mr Burris to prepare and file a complaint" in this case. Id at 2 ¶2. Washington states that "when [he] received the file, it contained a claim dated August 13, 2003. The matter had been referred to the Citizen's Complaint Review Board but had not been heard." Id. Washington states that he

> drafted the complaint on the basis of the facts stated in the claims which contained no allegations that Officer Clement shot Mr Willis. There were no documents in the file which indicated that there was more to the incident than had been described in the claim. I thought I had sufficient information to prepare the complaint.

Id ¶3. Accordingly, Washington admits that he drafted and filed plaintiffs' complaint based entirely on papers contained in a file; he conducted no independent investigation into the allegations. It appears Burris then signed the complaint with no further investigation.

Moreover, at the February 24, 2005, hearing, Washington represented that this inadequate investigation could be explained because the statute of limitations on plaintiffs' claims was about to expire. Notably, Washington's response to the OSC does not explain this blatantly false representation.

Finally, Washington states that "[w]hen I received

defendants' motion for judgment on the pleadings, I contacted the clients to review the facts and instructed an investigator to get statements from witnesses whose names I had received from the clients. I [then] learned that Officer Clement had taken the action which was first in the proposed amended complaint." Id at ¶4. In effect, therefore, Washington confirms that neither he nor Burris made a reasonable inquiry in this case prior to defendants' filing a motion for judgment on the pleadings pursuant to FRCP 12(c). In sum, the court has no trouble concluding that the prefiling factual investigation was objectively inadequate.

Further, had an investigation of the type made <u>after</u> the filing of defendants' Rule 12(c) motion been conducted <u>prior</u> to the filing of plaintiffs' complaint, the egregiously different facts contained in the FAC would no doubt have surfaced. In other words, the complaint was, objectively, factually baseless. After a reasonable investigation, a reasonable lawyer would have known the complaint was not well founded in fact. Had Burris and Washington conducted themselves as reasonable lawyers, defendants would not have been put to answering the frivolous original complaint and moving for judgment on the pleadings. Rule 11 sanctions are therefore appropriate.

### III

#### A

In response to the July 26, 2005, order, defendants submitted an accounting of attorneys' fees and expenses incurred in connection with plaintiffs' frivolous original complaint. That information has assisted the court in assigning a monetary value to

7

the burden imposed by Burris and Washington's sanctionable conduct. Although the court continues to believe that defendants should not have to bear the cost of defending against the original complaint, the court, regretfully, cannot award attorneys' fees and costs pursuant to Rule 11 given the posture of this proceeding. Rule 11 "distinguishes between sanctions imposed upon motion of a party and those imposed by show-cause order on the initiative of the court." Barber v Miller, 146 F3d 707, 711 (9th Cir 1998). Specifically, the court cannot on its own initiative impose sanctions by directing payment of attorneys' fees and expenses incurred as a result of a Rule 11 violation. Id.

Rule 11 sanctions are designed to deter, not compensate. The court finds that Burris and Washington's conduct is best deterred by forcing them to bear the social costs of their actions. Here, those costs include expenses needlessly incurred by defendants in litigating the original complaint; the court will fashion a sanction on this basis. The court does not suggest, however, that unnecessary legal fees are the only social consequences of carelessly invoking the judicial process.

With the benefit of defendants' submissions, the court turns to quantifying the burden that was unjustifiably imposed upon defendants by the filing of a frivolous complaint.

B

To determine a reasonable attorney fee award, the court employs the lodestar method. Yahoo!, Inc v Net Games, Inc, 329 F Supp 2d 1179, 1182 (ND Cal 2004). "Three figures are salient in a lodestar calculation: (1) counsel's reasonable hours, (2)

counsel's reasonable hourly rate and (3) a multiplier thought to compensate for various factors (including unusual skill or experience of counsel or the *ex ante* risk of nonrecovery in the litigation)." <u>In re HPL Technologies, Inc Securities Litigation</u>, 366 F Supp 2d 912, 919 (ND Cal 2005) (Walker, J). A multiplier is irrelevant to the fee calculation in this instance because the court need not consider the results achieved by defense counsel in connection with the original complaint. Indeed, the original complaint collapsed from the weight of its own inadequacies. Accordingly, the court need only consider defense counsel's reasonable hours and reasonable hourly rate in computing the lodestar.

Defendants requested compensation for 59 hours of legal services (49 hours expended by attorneys and 10 hours expended by a paralegal) performed in connection with (1) drafting and filing their original answer, (2) researching, drafting and filing their motion for judgment on the pleadings and (3) attending the February 24, 2005, hearing. Doc #39 (Hodgkins Decl) at 2-3. The court finds defendants' request for 59 hours to be reasonable.

The court now turns to determining a reasonable hourly rate. More than one methodology exists to make this determination. Billing all attorney time at a "blended" hourly rate is probably the appropriate methodology in most lodestar calculations based on its simplicity and promotion of efficiency. <u>HPL Technologies</u>, 366 F Supp 2d at 921. Such blended rates (perhaps in the $200 per hour neighborhood) typically depend on "the overall billing mix" including substantial time expended by junior attorneys with less experience and low hourly billing rates. Id.

In <u>Laffey v Northwest Airlines, Inc</u>, 572 F Supp 354 (DDC 1983), aff'd in part, rev'd in part on other grounds, 746 F2d 4 (DC Cir 1984), the court employed a variety of hourly billing rates to account for the various attorneys' different levels of experience. The <u>Laffey</u> methodology is useful when an unusually large fraction of either senior or junior attorney time is necessary, and spent, by counsel in light of the complexity of the issues presented in a case.

The court notes that defendants' counsel, namely James Hodgkins and Chris Kee, both have over 13 years of legal experience. Nevertheless, the court concludes that a "blended hourly rate" rather than the <u>Laffey</u> methodology is sufficient in this case to reflect the market rate for defendants' counsels' services. Plaintiffs' original complaint was far from complex; indeed, were it not for Burris and Washington's inexplicable behavior, this case would be a ordinary § 1983 complaint the likes of which the City of Oakland no doubt handles on a regular basis. Accordingly, while the court notes Hodgkins and Kee's many years of experience and the quality of work they have produced, such senior attorney time was not required to answer and draft a Rule 12(c) motion in the present case. Hence, a blended hourly rate is sufficient to compensate defendants.

On several occasions, the court has calculated an average market rate in the local legal community as a whole using public data from the United States Census Bureau and Bureau of Labor Statistics ("BLS"). See, e g, <u>Yahoo!</u>, 329 F Supp 2d at 1189; <u>Allen v Bay Area Rapid Transit Dist</u>, 2003 WL 23333580, at *6 (ND Cal 2003); <u>Gilliam v Sonoma City</u>, 2003 WL 23341211, at *3 (ND Cal

2003).  In Yahoo!, the court explained that:

> The BLS provides data on the hourly wages earned by attorneys * * *.  To estimate the hourly rates billed to clients, the court first calculated the ratio of net receipts to gross receipts from data compiled by the Census Bureau.  This ratio was used to approximate the overhead costs that would be incorporated in the hourly rates billed to clients.  The court then divided the BLS wage data ($w$) by the ratio of net receipts ($nr$) to gross receipts ($gr$) to determine an estimated average market rate ($r$) * * *.

Id at 1189.

This methodology is represented by the following equation:  $r = w / (nr/gr)$.  Stated another way, the average market rate $r = w * (gr/nr)$.  The most recent census data describing gross and net receipts by law partnerships are located in "Statistical Abstract of the United States:  2004-2005" ("2004 Statistical Abstract").  See United States Census Bureau, Statistical Abstract of the United States: 2004-2005, tbl 718, available at http://www.census.gov/statab/www/.  The 2004 Statistical Abstract provides gross and net receipts for the year 2001.  For law partnerships, gross receipts totaled $91 billion and net receipts totaled $32 billion.  This yields a ratio of net receipts to gross receipts of 0.351.  Even though these data are four years old, it is adequate for present purposes because law firm economics should not vary significantly over such a short period.

The most recent data available from the BLS describing hourly wages in the San Francisco area are located in "November 2003 Metropolitan Area Occupational Employment and Wage Estimates San Francisco, CA PMSA," available at http://www.bls.gov/oes/current/oes_7360.htm#b23-0000 ("2003 BLS Wage Estimates").  The BLS provides wage estimates for "Legal

11

Occupations" in the year 2003.  The BLS's estimates for lawyers are a median hourly wage of $65.01/hr and a mean hourly wage of $70.23/hr.  Id.  As in <u>Yahoo!</u>, the court selects the higher of the median or mean hourly wage.  Id at 1191.

Dividing the most recent mean hourly wage for lawyers, $70.23/hr, by the most recent ratio of net to gross receipts, 0.351, yields an estimate of $200/hr (rounded down from $200.08/hr) as the average market rate for lawyers in the San Francisco area.  Applying this rate to the present case, the Rule 11 sanctions will reflect $9,800 in attorney fees expended by Hodgkins and Kee (49 hours x $200/hour = $9,800).

Next, the court must determine the rate of compensation for the 10 hours of work expended by paralegal Garced in the present case.  Defendant state that Garced's 2004 billing rate is $92/hour.  Hodgkins Decl at 5.  Under the <u>Laffey</u> matrix, which makes no adjustment based on a paralegal's experience, the prevailing billing rate for paralegals in $110/hour.  See www.usdoj.gov/usao/dc/Divisions/Civil_Division?Laffey_Matrix_4html.  The court will simply split the difference and assign a rate of $100/hour to Garced's work.  The Rule 11 sanctions will reflect $1,000 in paralegal fees expended by Garced (10 hours x $100/hour = $1,000).

IV

Given the unitary nature of Burris and Washington's conduct in this case, they are jointly and severally liable for the full amount of the Rule 11 sanctions.  <u>Kona Enterprises, Inc v Estate of Bishop</u>, 229 F3d 877, 888-89 (9th Cir 2000); see also

**Pekarsky v Ariyoshi**, 575 F Supp 673, 676-77 (D Hawaii 1983) (Schwarzer, J).

Further, such sanctions are appropriate at this point in the proceedings.  Regardless whether the plaintiffs in this case ultimately prevail on claims asserted in the amended complaint, the present conduct of their counsel will not be vindicated.  Proving the truth of the amended -- and drastically different -- factual allegations will not alter the objective baselessness of the original allegations.  Sanctioning such conduct of Burris and Washington now puts to rest that matter and they may now move on into the second (and hopefully more promising) phase of this litigation.

V

The July 26, 2005, order (Doc #36) is VACATED.  John L Burris and Miles Washington are hereby SANCTIONED pursuant to FRCP 11.  Pursuant to FRCP 11(c)(1)(2), Burris and Washington are ORDERED to pay sanctions in the amount of $10,800 to the court on or before November 15, 2005.

SO ORDERED.

_____
**VAUGHN R WALKER**
United States District Chief Judge